1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10   STEPHEN D. KEENAN,

11            Plaintiff,                    No. 2:08-cv-02063 KJN

12        v.

13   MICHAEL J. ASTRUE,
     Commissioner of Social Security,
14
              Defendant.                    <u>ORDER</u>
15
     _____/
16

17            Plaintiff seeks judicial review of a final decision of the Commissioner of Social

18   Security ("Commissioner") denying, in part, plaintiff's application for Disability Insurance

19   Benefits under Title II of the Social Security Act ("Act").[1]  Plaintiff contends that the

20   Administrative Law Judge's ("ALJ") underlying determination that plaintiff is entitled to benefits

21   as of May 1, 2006, but not as of plaintiff's alleged disability onset date of December 24, 2004, is

22   not supported by substantial evidence or is based on legal error.  He requests a remand for the

23   calculation and award of benefits for the period beginning December 24, 2004, or alternatively, a

24

25        [1] This case was referred to the undersigned pursuant to Eastern District of California
     Local Rule 302(c)(15) and 28 U.S.C. § 636(c), and both parties have voluntarily consented to
     proceed before a United States Magistrate Judge.  (Dkt. Nos. 5, 7.)  This case was reassigned to
26   the undersigned by an order entered February 9, 2010.  (Dkt. No. 14.)

1  remand for a new hearing and decision limited to the determination of the date of onset of

2  plaintiff's disability.  For the reasons stated below, and as a result of the supplemental briefing

3  submitted by the parties, the undersigned remands this matter to the Commissioner for further

4  proceedings consistent with this order.

5  I.      BACKGROUND

6          A.      Procedural Background

7                  On June 7, 2005, plaintiff filed an application for Disability Insurance Benefits

8  ("DIB") alleging a disability onset date of December 24, 2004.  (Administrative Transcript

9  ("AT") 15, 56-58.)  The Social Security Administration denied plaintiff's application initially

10  and upon reconsideration.  (AT 45-49, 51-55.)

11                 On May 18, 2007, following plaintiff's timely request for a hearing, the ALJ

12  conducted a hearing on plaintiff's claims.  (AT 44, 287-327.)  Plaintiff and his wife testified at

13  the hearing, and plaintiff was represented by counsel.  (See AT 289-327.)

14                 In a decision dated July 18, 2007, the ALJ determined that plaintiff suffered from

15  severe diabetes, neuropathy, and hypertension that had rendered plaintiff disabled within the

16  meaning of the Act beginning May 1, 2006.[2]  (AT 20-21.)  However, the ALJ concluded that

17

18          [2] Disability Insurance Benefits are paid to disabled persons who have contributed to the
Social Security program, 42 U.S.C. §§ 401 et seq.  Supplemental Security Income ("SSI") is paid
19  to disabled persons with low income.  42 U.S.C. §§ 1382 et seq.  Under both benefit schemes, the
term "disability" is defined, in part, as an "inability to engage in any substantial gainful
20  activity" due to "any medically determinable physical or mental impairment which can be
expected to result in death or which has lasted or can be expected to last for a continuous period
21  of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A five-step
sequential evaluation governs eligibility for benefits.  See 20 C.F.R. §§ 404.1520,
22  404.1571-1576, 416.920, 416.971-976; see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).
The Ninth Circuit Court of Appeals has summarized the sequential evaluation as follows:

23
            Step one:  Is the claimant engaging in substantial gainful
24  activity?  If so, the claimant is found not disabled.  If not, proceed
to step two.
25                  Step two:  Does the claimant have a "severe" impairment?
If so, proceed to step three.  If not, then a finding of not disabled is
26  appropriate.

plaintiff was not disabled within the meaning of the Act between the alleged date of disability onset, December 24, 2004, and May 1, 2006.  (AT 18-20, 22.)  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review.  (AT 4-6.)

       B.    <u>Medical Evidence</u>

           1.    <u>Plaintiff's Relevant Treatment History</u>

           At the time of the administrative hearing, plaintiff was approximately 54 years old.[3]  (<u>See</u> AT 289-90.)  Plaintiff attended high school, trade school, and three years of college.  (AT 290.)  Plaintiff worked in the sheet metal industry, but, since approximately December 2004, had only made one attempt to work and was physically unable to continue after approximately four or five days.  (AT 290-92.)

           Plaintiff saw several treating physicians within the Kaiser system.  The medical records in the administrative transcript indicate that plaintiff first visited Laure M.B. Lee, M.D., on January 31, 2005.  (AT 151.)  Plaintiff reported to Dr. Lee that he had swelling and water retention, low back pain, abdominal pain, and leg cramps.  (AT 152.)  Dr. Lee made no clinical

---

           Step three:  Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four.

           Step four:  Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five.

           Step five:  Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled.

<u>Lester v. Chater</u>, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

      The claimant bears the burden of proof in the first four steps of the sequential evaluation process.  <u>Bowen</u>, 482 U.S. at 146 n.5.  The Commissioner bears the burden if the sequential evaluation process proceeds to step five.  <u>Id</u>.

     [3]  Throughout the medical records, the physicians who examined plaintiff noted that plaintiff was a smoker for roughly 30 years who had no interest in quitting, despite medical advice to the contrary.  (<u>See</u>, <u>e.g.</u>, AT 140, 141, 148, 198, 240, 241.)

findings other than that plaintiff was obese and had high blood pressure, but noted that plaintiff

needed certain medications.[4]  (AT 153.)  She also ordered an abdominal CT scan (AT 153),

which plaintiff underwent on February 11, 2005 (AT 165-66).  The results of that scan were

normal.

On March 8, 2005, Dr. Lee examined plaintiff.  (AT 148.)  Her notes indicate that

plaintiff requested that she find him disabled.  (AT 148.)  Dr. Lee noted that she told plaintiff that

although a finding of temporary disability was appropriate until his vision issues were assessed,

she would "not sign for permanent disability."  (AT 148.)

On March 18, 2005, plaintiff saw Dr. Lee and reported to her that his vision

continued to be "a huge problem."  (AT 148.)  Dr. Lee's treatment notes state, in part, that "due

to swing in blood sugars can't see to do metal sheet metal working."  (AT 148.)  That same day,

she completed part of a "Visit Verification/Family Leave Health Care Provider Certification"

form, wherein she noted: "Patient no longer able to work as sheet metal worker secondary to

vision changes with Diabetes."  (AT 150.)  Dr. Lee did not fill out the functional assessment

portion of the form.

On April 13, 2005, Dr. Lee completed a "Physician's Medical Report" for the

Sheet Metal Workers of Northern California Pension Plan on plaintiff's behalf.  (AT 145, 283

(duplicate).)  This form related to Dr. Lee's examination of plaintiff on March 18, 2005, and Dr.

Lee reported a diagnosis of "Diabetes, high blood pressure and elevated cholesterol."  (AT 145.)

The form asks a number of questions, and, in sum, Dr. Lee responded that: (1)  plaintiff was

"[u]nable to work as a sheet metal worker secondary to vision changes due to diabetes,"

(2) plaintiff was totally disabled as of March 18, 2005, (3) it was "unclear" whether the disability

---

[4]  The record contains a "patient progress record" for plaintiff, dated February 24, 2005, in which Dr. Lee indicated that plaintiff did not attend a course called "Diabetes Essentials Class."  (AT 147.)  The class was rescheduled for March 15, 2005.  (AT 147.)  In a subsequent patient progress record for plaintiff, Dr. Lee indicated that plaintiff did not attend the March 15, 2005 course.  (AT 146.)  This course was rescheduled for April 5, 2005, but it is unclear from the record whether plaintiff ever attended.

appeared to be permanent, and (4) plaintiff could perform no work. (See AT 145.)

On July 13, 2005, plaintiff saw Dr. Lee and reported pain in both calves at rest and with motion, tremors, unimproved vision (noting that "eye doctor says vision OK"), and sweats after eating. (AT 144.) Dr. Lee's physical examination revealed "[n]o apparent distress" and no clinical abnormalities. (See AT 144.)

On September 9, 2005, plaintiff visited Dr. Lee and reported "concerns" about a tremor or shakiness in his left hand, chronic numbness possibly as a result of a fall, blurry vision, inability to walk long distances due to right leg pain, and occasional sudden disorientation. (See AT 143.) On examination, Dr. Lee reported "[n]o apparent distress" and no clinical abnormalities. (See AT 143.) She also reported "no obvious resting tremor." (AT 143.)

On September 14, 2005, plaintiff underwent a brain MRI, which produced normal results. (AT 280.) The test ruled out "demyelinating disease," a nerve disease. (AT 280.)

On September 15, 2005, a neurologist, Judith B. Vaughn, M.D., examined plaintiff because of plaintiff's reported tremor. (AT 239-240.) On examination, Dr. Vaughn was unable to reproduce plaintiff's alleged tremor and reported no tremor, no visual disturbance, and an otherwise normal neurological examination. (AT 240.) Dr. Vaughn posited that plaintiff's reported tremors and visual disturbance could be the result of fluctuating blood sugar levels and that his leg pain and cramps could be due to diabetic neuropathy. (See AT 240.) She also noted that plaintiff's finger numbness was "an ulnar nerve distribution, likely compressive," but that it need not be treated. (AT 240.)

September 26, 2005, plaintiff again visited Dr. Lee because of continued leg pain. (AT 141-42.) Plaintiff reported cramping in his calves, constant pain in his right leg and a consistently "cold" left foot. (AT 141.) Dr. Lee assessed plaintiff as having claudication[5] and left leg pain. (AT 141.) She also noted that she was unable to palpate the popliteal pulse.

---

[5] The term "claudication" essentially refers to limping or walking with difficulty. Stedman's Medical Dictionary, 389 (Lippincott Williams & Wilkins, eds., 28th ed. 2006).

1    On October 5, 2005, plaintiff underwent a standard lumbar spine MRI.  The
2    results of that MRI were normal.  (AT 192, 277.)

3    On October 6, 2005, plaintiff had surgery to repair an incisional hernia.  (AT 138-
4    39.)  Although unrelated to the procedure, his surgeon noted that plaintiff's had a history of
5    "diabetes, obesity, hypertension, vision changes, occasional upper extremity tremor and
6    disorientation as well as lower extremity neuropathy and possible claudication."  (AT 140.)  Of
7    note, the surgeon observed "minimal lower extremity edema," but mild decreased nerve
8    sensation on the left side of plaintiff's face.  (AT 140.)

9    In a November 2, 2005 letter, Dr. Lee indicated that plaintiff had the following
10   conditions: "Diabetes, Diabetic Neuropathy bilateral extremities, Diabetic Neuropathy,
11   Hypertension, and Hyperlipidemia."[6]  (AT 136.)  She stated that "based on these conditions, it is
12   unlikely [plaintiff] can return to work as a sheet metal worker ever."  (AT 136.)

13   On November 14, 2005, plaintiff was referred to have an EMG/nerve conduction
14   study "for his left more than right distal leg numbness, cramping, and pain."  (AT 131.)  The
15   report stated that "[t]he normal sensory sural study would argue against peripheral sensory
16   neuropathy being related to [plaintiff's] symptoms," and that "[t]he needle examination revealed
17   diffuse axonal changes" at the paraspinal level to upper thoracic and in the upper extremities, but
18   less marked in the lower extremities.  (AT 132.)  The report provided a differential diagnosis that
19   included "metabolic myoneuropathies, motor neuron disorders, or cervical stenosis, to begin the
20   list."  (AT 132.)

21   On November 22, 2005, plaintiff underwent a standard cervical spine MRI as a
22   result of his lower extremity pain.  The MRI results were normal.  (AT 269.)

23   On January 19, 2006, George Palma, M.D., conducted a neurological examination
24   of plaintiff.  (AT 264.)  Dr. Palma reported a normal neurological examination, but stated that he

25
26        [6]   The actual recipient of the letter is unclear.  The letter is addressed to plaintiff, but the
     salutation reads: "Dear Sirs."  (AT 136.)

1    believed plaintiff had a "statin-induced myopathy" possibly resulting from plaintiff's use of

2    Lovastatin medication for extreme hyperlipidemia.  (AT 264.)

3                      During a January 30, 2006 follow-up visit with Dr. Lee, plaintiff claimed to have

4    had a seizure, although the notes indicate there was no witness and no resulting incontinence.

5    (AT 226.)  Plaintiff also reported continued "muscle symptoms," and the treatment notes indicate

6    that plaintiff's weight gain could not be explained by fluid retention.  (AT 226-27.)  The notes of

7    this visit indicate a "primary encounter diagnosis" of "Myopathies, Metabolic."  (AT 226.)

8                      On March 2, 2006, plaintiff underwent a whole-body bone scan.  The results were

9    reported as "[e]ssentially normal."  (AT 263.)

10                     On March 6, 2006, plaintiff visited Dr. Cosens, complaining of leg cramps and leg

11   pain.  (AT 225.)  Plaintiff reported morning leg tremors and his inability to get warm, with

12   subsequent leg pain.  (AT 224.)  He also reported that this leg pain sensation lasts for 45 to 60

13   seconds, then resolves, but recurs every two minutes.  (AT 224.)  He further reported bilateral

14   hand tremors so severe that he could not eat soup.[7]  (AT 224.)  Dr. Cosens's "assessment" was

15   that plaintiff had "myopathy."

16                     On April 10, 2006, plaintiff again visited Dr. Palma.  (AT 262.)  The neurological

17   exam conducted was normal, "except for tremor of hands."  (AT 262.)  Dr. Palma revisited his

18   previous theory of statin-induced myopathy and stated that he suspected a diagnosis of

19   "mitochondrial myopathy."[8]  (AT 262.)  Dr. Palma's notes also state: "[Plaintiff's] neurological

20   examination is normal except for tremor of hands."  (AT 262.)

21                     On May 3, 2006, Lisa Cosens, M.D., filled out an RFC assessment form provided

22   by a law firm, which noted an unconfirmed primary diagnosis of "[m]itochondrial myopathy"

23

24        [7]  Plaintiff reported that he thought a "fungal toenail started all of his difficulties," but the
     treatment notes appear skeptical of this conclusion.  (AT 224.)

25        [8]  Dr. Palma ordered a muscle biopsy that took place on May 11, 2006.  (See AT 258,
     262.)  Although the results of this biopsy do not appear to be contained in the record, plaintiff
26   testified that the results were negative.  (AT 293.)

1   and a secondary diagnosis of hypertension based on "[d]iffuse muscle pain, muscle fatigue,

2   weakness with normal x-rays and abnormal EMG."  (AT 189 (noting that a muscle biopsy was

3   pending); <u>see</u> <u>also</u> 259-61 (duplicate).)  She reported the "Onset of Diagnosis" as "March, 2005."

4   (AT 189.)  As to her functional assessment of plaintiff, Dr. Cosens opined that during an eight-

5   hour workday plaintiff could walk for less than one hour, stand for less than one hour, sit for six

6   to eight hours with interruption, occasionally lift up to ten pounds, could not climb stairs or

7   ladders, and required a ten-minute rest break every hour.  (AT 189-90.)  Finding that plaintiff

8   was credible, Dr. Cosens concluded that due to chronic pain plaintiff could not perform the full

9   range of sedentary work as defined in the form and could not work eight hours per day for five

10   days per week.  (AT 190-91.)  She also opined that plaintiff's condition was "likely permanent,"

11   would worsen over time, and was not subject to improvement.  (AT 191.)

12          On February 27, 2007, Dr. Cosens completed out a "Diabetes Mellitus

13   Impairment Questionnaire" for plaintiff.  (AT 203-08.)  The form indicates that plaintiff was first

14   treated for diabetes on March 18, 2005.  (AT 203.)  Related to plaintiff's diabetes, Dr. Cosens

15   noted "primary symptoms" of "Renal manifestations . . . Leg tremors, cold sensation, pain in

16   extremities, [and] hand tremors."  (AT 204.)  The form also contains a functional assessment

17   component, in which Dr. Cosens indicated that in an eight-hour workday, plaintiff could sit

18   intermittently for eight hours, stand/walk for zero to one hour, and should get up and move

19   around every fifteen to thirty minutes.  (AT 206.)  Dr. Cosens noted that plaintiff could at most

20   lift up to twenty pounds occasionally, carry up to ten pounds occasionally, and should not push,

21   pull, kneel, bend, or stoop.  (AT 206-08.)  In addition, the form presented the following question:

22   "In your best medical opinion, what is the earliest date that the description of symptoms and

23   limitations in this questionnaire applies?"  (AT 208.)  Dr. Cosens responded: "Around end of

24   2005."  (AT 208.)  Finally, Dr. Cosens included the following comment: "Disability status for

25   one year—Patient may have improvement in condition over time."  (AT 208.)

26   ////

1              2.      Examination and Functional Assessment by Dr. Seu

2              On September 1, 2005, Philip Seu, M.D., conducted an internal medicine

3     examination of plaintiff at the Social Security Administration's request.  (See AT 124-27.)  Dr.

4     Seu listed plaintiff's "chief complaints" as diabetes, high blood pressure, vision problems, and

5     leg pain.  (AT 124.)  He noted that blood work from February 2005 showed elevated cholesterol

6     and triglycerides, as well as other results that were in the "diabetic range."  (AT 124.)  As to

7     plaintiff's diabetes, plaintiff reported that his blood sugar was "usually pretty good," but

8     occasionally spiked.  (AT 124.)  Plaintiff reported that his doctors told him that there were no

9     "other complications of diabetes such as eye involvement."  (AT 124.)  Plaintiff reported that his

10    high blood pressure was poorly controlled on his prescribed medication.  (AT 124.)  Plaintiff

11    further reported that although he had been told by his doctors that he had "no organic eye

12    problems," his vision was dull and blurry at times and that glasses did not help.  (AT 125.)  He

13    stated that he had pain in both feet that radiated into his legs and worsened after prolonged

14    standing or walking.  (AT 125.)  Plaintiff reported to Dr. Seu that "he can do the work around the

15    house such as cooking and cleaning and doing dishes.  He walks several blocks to the store to do

16    shopping and can drive."  (AT 125.)

17             On physical examination, Dr. Seu noted that plaintiff was obese, but in "no

18    distress," and that plaintiff was at ease getting on and off the examination table and taking off his

19    shoes.  (AT 125.)  He noted that plaintiff could read the wall clock from fifteen feet away and

20    count the fingers on Dr. Seu's hand.  (AT 125.)  Dr. Seu also observed that plaintiff's gait was

21    normal and that he could "do finger-to-nose and heel-to-toe without difficulty."  (AT 126.)  He

22    found that there was "no evidence of swelling, tenderness, or inflammation of [plaintiff's] joints"

23    and no obvious deformities, but that plaintiff had trace edema or swelling in his lower legs.  (AT

24    126.)  Dr. Seu further observed that plaintiff's sensory exam was normal, his motor skills were

25    "5/5 in all muscle groups," that his bilateral grip strength was normal, and there was no evidence

26    of atrophy.  (AT 126.)

1    Dr. Seu diagnosed plaintiff as a non-insulin dependent person whose history was

2   consistent with "diabetic neuropathy," but noted "no objective findings of diabetic

3   complications."  (AT 126-27.)  He also stated that plaintiff had: "slightly elevated" blood

4   pressure and was medicated for high blood pressure; fair visual acuity that day, but complained

5   of episodic changes that "may be related to his diabetes or high blood pressure;" and foot pain

6   consistent with "diabetic neuropathy," but no ulcers or infections and "no significant gait or

7   balance problems due to his neuropathy."  (AT 127.)

8    Finally, with respect to functional assessment, Dr. Seu opined that "[t]he number

9   of hours [plaintiff] could be expected to stand and walk in an eight-hour workday is without

10  limitation. . . .  The number of hours he could sit in a workday is without limitations."  (AT 127.)

11  Dr. Seu further opined that plaintiff had no postural, manipulative, or environmental limitations,

12  and that the amount of weight plaintiff could lift frequently and occasionally is without

13  limitation.  (AT 127.)

14    3.    Functional Assessment by Reviewing Physician

15    On February 9, 2006, a State agency physician, Dr. Charles Friedman,[9] reviewed

16  the medical record and completed a Physical Residual Functional Capacity Assessment form.

17  (AT 167-74.)  He listed plaintiff's diagnoses as a neurological disorder, diabetes mellitus, a

18  vision problem, high blood pressure, and obesity.  (AT 167.)  Dr. Friedman opined that plaintiff

19  could: occasionally lift fifty pounds, frequently lift twenty-five pounds, stand and/or walk for

20  about six hours in an eight-hour workday, and sit with normal breaks for about six hours in an

21  eight-hour workday.  (AT 168.)  He noted no other specific limitations other than a vision

22  limitation related to "[f]ar acuity" and that plaintiff should avoid moderate exposure to extreme

23  cold.  (AT 168-71.)  Dr. Friedman further stated that the treating physician exams did not support

24  plaintiff's allegations.  (AT 174.)  Specifically, he stated that plaintiff's hand tremors were absent

25

26    [9]  Although the signature on the RFC assessment form is illegible (AT 174), the
consultation request suggests that the reviewing physician is Charles Friedman, M.D.  (AT 176.)

on exam, plaintiff's allegation of claudication was not definitively diagnosed in the medical

records, plaintiff's peripheral pulses have been adequate, and that there had not been observed

muscle atrophy or reflex abnormality.  (AT 174.)

       C.     Summary of Relevant Hearing Testimony

       At the administrative hearing, plaintiff testified that his doctors had diagnosed

him as having an "underlying neurological disorder," and that the "best guess" was Dr. Palma's

diagnosis of mitochondrial myopathy.  (AT 293.)  Plaintiff stated that his diabetic condition, high

blood pressure, and high cholesterol were "under control" and that he had not taken medications

for those conditions in the prior seventeen months.  (AT 293.)

       With respect to the timing of plaintiff's symptoms, he testified that his severe

tremors, fatigue, and other allegedly debilitating symptoms began as early as February of 2005.

(See AT 298-99.)  Although plaintiff's wife's testimony at the hearing corroborated plaintiff's

testimony regarding the nature of his symptoms and their severity (e.g., tremors, fatigue, etc.),

she was not questioned regarding the onset of his symptoms.

       D.     Summary of the ALJ's Findings

       The ALJ conducted the required five-step evaluation and concluded that plaintiff

was disabled beginning May 1, 2006.  At step one, the ALJ concluded that plaintiff had not

engaged in substantial gainful activity since December 24, 2004, the alleged date of onset.  (AT

17.)  At step two, the ALJ concluded that since the alleged onset date, plaintiff had the following

severe impairments: diabetes, neuropathy, and hypertension.  (AT 17.)  At step three, the ALJ

determined that plaintiff's impairments, whether alone or in combination, did not meet or

medically equal any impairment listed in the applicable regulations.  (AT 18.)  The ALJ further

determined that prior to May 1, 2006, plaintiff had the residual functional capacity ("RFC") to

////

////

////

11

1  perform light work.[10]  (AT 18-19.)  At step four, the ALJ found that plaintiff had been unable to

2  perform his past work as a sheet metal worker as of the alleged onset date because that relevant

3  work requires medium-to-heavy work tasks.  (AT 21.)  The ALJ concluded at step five that for

4  the period prior to May 1, 2006, Medical-Vocational Guideline[11] 202.14 directed a finding that

5  plaintiff was "not disabled" because he could essentially perform the full range of light work,

6  considering plaintiff's age, education, and work experience.  (AT 21-22.)  He concluded,

7  however, that as of May 1, 2006, plaintiff could not perform other work such that he was

8  disabled as of that date.  (AT 22.)

9  II.     ISSUES PRESENTED

10          Plaintiff's overarching contention is that the ALJ erred by determining that

11  plaintiff was "not disabled" prior to May 1, 2006.  He contends that the ALJ ignored,

12  misrepresented, or improperly weighed treatment notes and medical opinions in the record in

---

14  [10]  In determining that plaintiff had the RFC to perform light work, the ALJ noted that
   plaintiff's "statements concerning the intensity, persistence and limiting effects of these [alleged]
15  symptoms are not entirely credible prior to May 1, 2006."  (AT 19.)  The ALJ did not make an
   express adverse credibility finding, and plaintiff has not challenged this statement by the ALJ as
16  an improper or unsupported adverse credibility finding.

17  [11]  The Ninth Circuit Court of Appeals has described the Medical-Vocational Guidelines,
   or the "grids," which appear at 20 C.F.R. Part 404, Subpart P, Appendix 2, as follows:

18          The grids are applied at the fifth step of the analysis under 20 C.F.R. §
                404.1520, and present, in table form, a short-hand method for determining
19          the availability and numbers of suitable jobs for a claimant. [Tackett v.
                Apfel, 180 F.3d 1094, 1101 (9th Cir.1999).]  The grids categorize jobs by
20          their physical-exertional requirements, and set forth a table for each
                category.  A claimant's placement within the appropriate table is
21          determined by applying a matrix of four factors identified by Congress - a
                claimant's age, education, previous work experience, and physical ability.
22          For each combination of these factors, they direct a finding of either
                "disabled" or "not disabled" based on the number of jobs in the national
23          economy in that category of physical-exertional requirements.  Id.  If a
                claimant is found able to work jobs that exist in significant numbers, the
24          claimant is generally considered not disabled.  Heckler v. Campbell, 461
                U.S. 458, 461 (1983).

26  Tommasetti v. Astrue, 533 F.3d 1035, 1043 n.4 (9th Cir. 2008) (modifications in original)
   (quoting Lounsburry v. Barnhart, 468 F.3d 1111, 1114-15 (9th Cir. 2006)).

1   erroneously concluding that plaintiff was not disabled until May 1, 2006.

2   III.    STANDARDS OF REVIEW

3           The court reviews the Commissioner's decision to determine whether it is (1) free

4   of legal error, and (2) supported by substantial evidence in the record as a whole.  Bruce v.

5   Astrue, 557 F.3d 1113, 1115 (9th Cir. 2009); accord Vernoff v. Astrue, 568 F.3d 1102, 1105 (9th

6   Cir. 2009).  This standard of review has been described as "highly deferential."  Valentine v.

7   Comm'r of Soc. Sec. Admin., 574 F.3d 685, 690 (9th Cir. 2009).  "'Substantial evidence means

8   more than a mere scintilla but less than a preponderance; it is such relevant evidence as a

9   reasonable mind might accept as adequate to support a conclusion.'"  Bray v. Comm'r of Soc.

10  Sec. Admin., 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting Andrews v. Shalala, 53 F.3d 1035,

11  1039 (9th Cir. 1995)).

12  IV.     ANALYSIS

13          In briefing the cross-motions before the court, the parties focused on the ALJ's

14  treatment of the medical opinions in the administrative record in reference to the disability onset

15  date, but did not address whether the ALJ committed reversible legal error by not employing the

16  services of a medical expert in light of an ambiguity as to the correct disability onset date.  The

17  overarching dispute in this matter is whether the ALJ properly determined the date when plaintiff

18  became "disabled" within the meaning of the Act.  In initially assessing the record, which spans

19  years, it was apparent to the undersigned that potential ambiguity existed regarding the correct

20  onset date.  Interpreting the policy statement contained in Social Security Ruling 83-20, the Ninth

21  Circuit Court of Appeals has held that where the date of the onset of the disability is unclear, an

22  ALJ commits reversible legal error by failing to call a medical expert or medical advisor before

23  inferring an onset date.  See, e.g., Armstrong v. Comm'r of Soc. Sec. Admin., 160 F.3d 587, 589-

24  90 (9th Cir. 1998) ("If the 'medical evidence is not definite concerning the onset date and

25  medical inferences need to be made, SSR 83-20 requires the administrative law judge to call

26  upon the services of a medical advisor and to obtain all evidence which is available to make the

1  determination.'") (quoting <u>DeLorme v. Sullivan</u>, 924 F.2d 841, 848 (9th Cir. 1991)); <u>Morgan v.</u>

2  <u>Sullivan</u>, 945 F.2d 1079, 1082-83 (9th Cir. 1989); <u>see</u> <u>also</u> <u>Quarles v. Barnhart</u>, 178 F. Supp. 2d

3  1089, 1095-97 (N.D. Cal. 2001).

4          Because of the potential ambiguity regarding the disability onset date presented by

5  the record, the undersigned ordered the parties to file supplemental briefs addressing "whether

6  the ALJ committed reversible legal error in this case by failing to call a medical expert or

7  medical advisor before determining the date of the onset of plaintiff's disability."  (Dkt. No. 15 at

8  2.)  The parties filed supplemental briefs.  (Dkt. Nos. 16, 17.)

9          Plaintiff's supplemental brief asserts that the ALJ committed no reversible legal

10  error by not consulting with a medical expert or advisor regarding plaintiff's disability onset date

11  because "the medical evidence *is* definite."  (Dkt. No. 16 at 2 (emphasis in original).)  Plaintiff

12  essentially relies on his prior briefing.

13          The Commissioner, however, filed an ambiguous supplemental brief that all but

14  concedes that the ALJ erred by not calling a medical expert or advisor in assessing the disability

15  onset date.  His analysis begins with a statement that "[t]he onset of Plaintiff's disability in the

16  instant case is not clear and therefore had to have been inferred by the ALJ."  (Dkt. No. 17 at 2.)

17  After recounting some of the medical evidence in the record, the Commissioner asserts that he

18  "maintains his position that the ALJ's decision was supported by substantial evidence in the

19  record in accordance with 42 U.S.C. § 405(g)."  (<u>Id</u>. at 3.)  Curiously, however, although the

20  Commissioner does not expressly concede that the ALJ committed legal error, he admits that:

21  (1) the onset date in this case was not clear and had to be inferred by the ALJ; (2) it is a

22  reasonable conclusion that the ALJ should have obtained medical expert testimony in order to

23  properly determine plaintiff's disability onset date; and (3) "the facts of this case implicate the

24  Ninth Circuit's rulings in <u>Armstrong</u>, <u>DeLorme</u> and <u>Morgan</u>."  (<u>Id</u>.)

25          Upon review of the record in this case, and in light of the Commissioner's

26  supplemental brief, the undersigned concludes that the ALJ committed reversible legal error by

14

not calling a medical expert or advisor to assist in the determination of plaintiff's disability onset date.  Notwithstanding the Commissioner's position that substantial evidence supports the ALJ's decision, the court must evaluate the ALJ's decision not only for substantial evidence supporting the decision, but must also review the decision to determine whether it is free of legal error. Bruce v. Astrue, 557 F.3d at 1115.  Because reversible legal error is present on this record, the undersigned will remand this case to the agency for further proceedings.

V.     CONCLUSION

Based on the foregoing, IT IS HEREBY ORDERED that:

1.     The Commissioner's decision in this matter is reversed and the matter is remanded to the Commissioner for further proceedings, which shall include consultation of a medical expert or advisor with respect to the disability onset date.  See 42 U.S.C. 405(g), sentence four.

2.     The Clerk of Court is directed to enter a separate judgment herein, as provided for under Rules 58 and 79(a) of the Federal Rules of Civil Procedure.  See Shalala v. Schaefer, 509 U.S. 292, 296-97 (1993).

IT IS SO ORDERED.

DATED:  May 14, 2010

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE